Filed 7/2/21  P. v. Beltran CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074877 |
| v. | (Super.Ct.No. INF1801844) |
| GERARDO BELTRAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James T. Latting, Judge.  Affirmed with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Gerardo Beltran of two counts of robbery and found that he personally used a firearm in the commission of those offenses.  (Pen. Code, §§ 211,

1

12022.5, subd. (a).) Beltran also pled guilty to one count of unlawfully possessing ammunition. (Pen. Code, § 30305, subd. (a).) The trial court sentenced him to a total of 20 years in prison.

Beltran's accomplice in the robberies, Carlos Alberto Briones, pled guilty and testified at Beltran's trial. Beltran argues that the trial court erred by restricting his cross-examination of Briones. He also argues that the prosecutor misstated the burden of proof in her rebuttal argument and that defense counsel committed ineffective assistance by failing to object to the argument. Beltran further contends that the court erroneously instructed the jurors that they could consider a witness's certainty in evaluating eyewitness identification testimony. Lastly, he argues that the abstract of judgment erroneously fails to state that the court imposed victim restitution jointly and severally. We order the court to amend the abstract of judgment, but we otherwise affirm.

BACKGROUND

In August 2018, a fruit vendor was selling produce at an intersection in Palm Springs. A dark-colored four-door car parked near the vendor, and a man exited the passenger side. The man pointed a gun at the vendor and took the vendor's money and cellular phone. The bottom half of the robber's face was covered by a mask, and he was wearing a hooded sweatshirt. The robber got into the front passenger seat of the four-door car, and the car sped away. There was one other person in the car.

A witness who was driving by described the robber as short and heavyset. The witness called 911 and waited with the vendor for the police to arrive. The vendor told

2

police that the robber was roughly five feet three inches tall, bald, and about 40 years old. At trial, the vendor described the robber as Hispanic and about 35 years old.

In September 2018, two women were waiting for a bus at the intersection where the fruit stand robbery occurred. A blue four-door car stopped next to them. A man exited the passenger side of the car, pointed a gun at them, and took one woman's purse. The bottom half of the robber's face was covered by a handkerchief, and his head was covered by the hood on his hooded sweatshirt. One of the women described the robber as Hispanic and "a little thick" with dark hair. The other woman said that he was Hispanic and young with black hair, but she could not recall his height; as to body type, she said that he was neither "very fat" nor "very slim." The robber got back into the car, and the car sped away. The driver and the robber were the only people in the blue car.

A witness who was driving by described the robber as average height and heavyset. The witness called 911 and reported a partial license plate number for the robber's getaway car. A few days later, the same witness saw the getaway car again, and she wrote down the entire license plate number. The investigating officer ran a search on that license plate number and found that Briones was the registered owner of the getaway car.

Briones and Beltran are cousins. Law enforcement interviewed Briones in October 2018. He was under the influence of methamphetamine and had not slept for days. He had been using methamphetamine almost every day for four years. Briones claimed that he told the truth during his interview and that he testified truthfully at trial. He was not afraid that Beltran was going to retaliate against him. Briones's goal in

3

talking to law enforcement was to appear cooperative. He knew that a witness had seen his car at the scene of a robbery and that he was in some trouble.

The week before Beltran's trial, Briones pled guilty to three counts of robbery and one count of petty theft.[1] Briones did not negotiate a disposition with the district attorney's office or enter into a plea agreement. The district attorney's office did not guarantee him leniency or make any other promises regarding his sentencing or testimony. He did not receive any benefits from the district attorney's office for pleading guilty. The court had sentenced him by the time he testified at trial.

Briones said that he did not plead guilty "to get out of jail." Rather, he saw it as a way "to start a new life" and "to move on." He was "broken" and "dead on the inside from all the drugs and all the mistakes" that he had made with his family.

In August and September 2018, Briones drove a blue four-door Honda. He recalled that he and Beltran stopped at a fruit stand. Beltran said that he was getting some fruit and got out of the passenger side of the car. Briones did not watch Beltran and was probably looking at his cellular phone. Beltran returned to the car, and they left. Briones never saw anything covering Beltran's face. Briones did not ask Beltran where the fruit was. Briones did not recall what he was thinking; he was under the influence of methamphetamine at the time and did not remember many things.

---

[1]    Beltran's jury deadlocked on the third robbery count with which he and Briones were charged, and the court declared a mistrial as to that count (count 2). We do not discuss the evidence relating to that robbery count.

Briones recalled stopping at the bus stop at the same intersection sometime in September 2018. Beltran asked Briones to pull into the bus stop and said that he was going to make some money for gas. Briones did not remember whether there was anyone at the bus stop. He did not watch Beltran and was looking at his cellular phone. Beltran got back into the car and said, "'Let's get the fuck out of here.'" Although Briones thought that Beltran was joking, he ran a red light and sped away. Briones was "under the influence of a lot of drugs" and "probably tripping out." He did not see a purse, and Beltran never gave him any gas money. Beltran did not have anything on his face when he got out of the car or when he returned.

Briones said that he did not know Beltran was going to rob anyone at the fruit stand or the bus stop, he did not realize that the robberies were happening at the time, and he did not realize that they had occurred even afterward. In short, he did not know if Beltran actually committed the robberies. He had never seen Beltran with a firearm and had never heard Beltran talk about having one.

Briones testified that he and Beltran went directly to a casino after the bus stop incident. The casino is roughly three miles from the bus stop. Briones estimated that it took 10 to 15 minutes to drive there. Officers were dispatched to the scene of the bus stop robbery at 4:26 p.m., after the victim went to a nearby store and asked an employee to call 911.

The prosecutor played the surveillance video from the casino. The video showed Briones's car arriving at the casino at 4:32 p.m. The investigating officer identified Briones and Beltran in the video.

5

The prosecutor showed Briones still photographs from the surveillance video. Briones identified himself in the photographs and believed that the man with him was Beltran, but he could not identify the man and said that the photographs did not look like Beltran because of their poor quality.

Later in September 2018, Briones snatched a woman's purse from a shopping cart in a parking lot. He took it "[j]ust for the rush." He did not recall what he did with the purse, but he probably threw it away.

Beltran was 26 years old when law enforcement interviewed him in October 2018. He was five feet seven inches tall and weighed 220 pounds. Beltran told the investigating officer that he did not know Briones and that he did not have a cousin by that name. Officers found .38-caliber ammunition at Beltran's home.

## DISCUSSION

### I. *Cross-Examination of Briones*

Beltran argues that the court's evidentiary rulings improperly restricted his cross-examination of Briones and violated Beltran's constitutional rights. The argument lacks merit.

#### A. *Additional Background*

On cross-examination, defense counsel asked Briones whether he pled guilty "to get out of jail." The prosecutor objected under Evidence Code section 352 (unlabeled statutory citations refer to this code), and the court sustained the objection. At a sidebar conference, defense counsel argued that Briones's reason for pleading guilty was relevant, particularly because Briones testified that he had nothing to do with the

robberies. The prosecutor argued that it was "highly prejudicial" to imply that Briones pled guilty to get out of jail, because "a sentence still continues for the formal term of probation." The court replied: "Right. That's why I sustained the [section] 352 objection for that reason. I think it's more prejudicial than probative." But the court ruled that defense counsel could ask Briones why he pled guilty. The court explained: "It's cross-examination. He can say whatever he wants to. But there is an issue, I think, in the jury's mind. Why the heck did you plead guilty if you're now saying you knew nothing."

Defense counsel asked Briones why he pled guilty, and as discussed *ante*, Briones testified that he did not plead guilty "to get out of jail," and he saw it as a way "to start a new life" and "to move on." Counsel also asked why he pled guilty if he did not know whether the robberies actually occurred, and Briones responded: "Because it seemed like it—it did. And the only way to get out of this mess was to manipulate my way out of it, and that was going to take a long time. And still when I would get out in—what?— twelve, whatever my max was—I was still going to have three strikes." The prosecutor objected to that testimony and moved to strike it but did not state the basis for her objection. The court sustained the objection and struck the testimony.

Defense counsel asked Briones if he was "trying to manipulate [his] way to avoid punishment." Briones said: "I am getting punished." Counsel responded: "But you mentioned something about trying to manipulate." Briones explained: "No. I said I didn't want to manipulate my way out of it."

7

When defense counsel asked whether Briones was scared of "pointing a finger" at Beltran, Briones replied: "Not that I'm scared. It's—I'm paying for my mistakes when I was under the influence and all the stupidity that I did. And this step in my life was going to take for me to open my eyes, it might as well—aside from the three strikes, it's not a slap on the wrist, man. It's going to affect me for the rest of my life." The prosecutor again objected but did not state the basis for her objection, and she moved to strike the testimony. The court sustained the objection and struck the testimony.

Later, when the court was discussing exhibits with the parties, the prosecutor asked to redact the word "strike" from Briones's plea form. (She had introduced Briones's plea form during her direct examination of him.) The prosecutor observed that the charges against Briones and Beltran were identical, and she argued that the jurors were not supposed to consider potential sentence or punishment. She explained that she had objected anytime Briones had mentioned "'strike[s]'" for the same reason. The court granted her request to redact "strike" from the plea form, reasoning that "the jury should not consider punishment in deliberating in this case since the charges are identical." The prosecutor later decided not to move the plea form into evidence.

B. *No Abuse of Discretion or Prejudice*

Beltran contends that the court erroneously precluded him from fully cross-examining Briones about Briones's reasons for pleading guilty and Briones's sentence. Beltran cites (1) the two rulings striking Briones's testimony and (2) the ruling sustaining the objection to the question about whether Briones pled to get out of jail. Beltran fails to show that those rulings were an abuse of discretion.

8

Evidence about a defendant's potential punishment is irrelevant. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 687 (*Alvarez*) ["'[T]he trier of fact is not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict . . .'"].) Such evidence "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." (*Shannon v. United States* (1994) 512 U.S. 573, 579.) Jurors might "'permit their consideration of guilt to be deflected by a dread of seeing the accused suffer the statutory punishment.'" (*Alvarez*, *supra*, at p. 687; accord *People v. Nichols* (1997) 54 Cal.App.4th 21, 24.)

Evidence showing the "'existence or nonexistence of a bias, interest, or other motive' on the part of a witness ordinarily is relevant to the truthfulness of the witness's testimony." (*People v. Williams* (2008) 43 Cal.4th 584, 634, quoting § 780, subd. (f).) A defendant generally "is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544 (*Brown*).)

While the trial court should give the defense wide latitude to test the credibility of a prosecution witness, "such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance.'" (*Brown*, *supra*, 31 Cal.4th at p. 545.) Thus, like any other relevant evidence, impeachment evidence is excludable under section 352 if its probative value is substantially outweighed by the probability that the evidence will confuse the issues, mislead the jury, or create undue prejudice. (*People v. Ayala* (2000)

9

23 Cal.4th 225, 301 (*Ayala*) ["'[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad'"].)

Even if the court "did not expressly base its ruling on [section 352], we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582, overruled on another ground by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305; see also *Ayala*, *supra*, 23 Cal.4th at pp. 300-301 [concluding that the trial court implicitly ruled the excluded evidence would mislead the jury, and reviewing the ruling under section 352].) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

The court did not abuse its discretion by limiting the cross-examination of Briones. It did not prevent Beltran from questioning Briones about his reasons for pleading guilty. The court sustained the prosecutor's objection when defense counsel asked if Briones pled guilty "to get out of jail." At the sidebar conference, the court ruled that defense counsel could not phrase the question that way, but counsel could ask why Briones pled guilty. Briones answered that question. Beltran does not explain how the court erred by directing defense counsel to phrase the question in that manner. He suggests that the court precluded him from establishing that Briones received probation, but that was not the question defense counsel asked. And Beltran does not cite any point at which he tried to introduce evidence that Briones received probation, and the court excluded it. Beltran cannot prevail on appeal by challenging rulings that the court never made. (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1303-1304 [the defendant failed

to show the court erroneously excluded a witness's testimony, because defense counsel never proffered the testimony, and there was no ruling excluding it].)

Moreover, the court did not abuse its discretion by striking Briones's references to three strikes and a potential 12-year sentence. The evidence was excludable under section 352. Briones's view of his potential punishment was relevant to show bias in favor of the People or motive to lie, but the probative value of the evidence was minimal. It would have added little to the other evidence showing such bias or motive. (See *People v. Balcom* (1994) 7 Cal.4th 414, 423 [evidence that was cumulative on an issue had limited probative value].) Briones did not testify pursuant to any plea agreement or negotiated disposition, and the People did not offer him any benefits in exchange for his guilty plea. But he testified that he knew he was in trouble when the investigating officer interviewed him, and he knew that the officer had connected his car to the robbery scene. He said that he wanted to appear cooperative. The investigating officer testified that Briones was "really forthcoming" during the interview. Thus, even without the stricken testimony, the jurors could reasonably infer from the evidence that Briones was cooperating with law enforcement in the hope that he would be treated leniently.

The court reasonably concluded that the minimal probative value of the evidence was outweighed by the risk of confusing or misleading the jury and undue prejudice. While Briones's stricken testimony referred to his own punishment, the jurors knew that he had pled guilty to the same three robberies for which Beltran was on trial. They could reasonably infer that Beltran was facing similar punishment. Admission of the evidence thus risked confusing the issues and misleading the jurors into consideration of Beltran's

11

potential punishment, which was irrelevant. The evidence was also unduly prejudicial in that it invited the jurors to reward the defense because of an emotional reaction to Beltran's potential punishment. (*People v. Valdez* (2012) 55 Cal.4th 82, 145 [test for prejudice is "whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction"].)

Beltran relies on *People v. Mickle* (1991) 54 Cal.3d 140 (*Mickle*), but that case is distinguishable. There, a prosecution witness had three criminal cases pending against him. (*Id.* at pp. 160, 167.) He wrote letters to the judges in those three cases, offering to inform on various individuals in exchange for leniency and explaining that he feared injury in prison. (*Id.* at p. 167.) The *Mickle* court held that the trial court erred by excluding the letters as irrelevant. (*Id.* at p. 168.) The letters were relevant impeachment evidence because they implicitly contradicted the witness's claim that he was testifying for "purely unselfish reasons," and they "suggested that he had a heightened interest in currying favor with the prosecution on parole and avoiding the risk of harm he associated with imprisonment." (*Ibid.*) Still, the *Mickle* court concluded that exclusion of the letters and other impeachment evidence was harmless. (*Id.* at p. 169.)

*Mickle* held that the letters were relevant, but it did not address whether the letters were nevertheless excludable under section 352, as was the case here. *Mickle* thus does not persuade us that the trial court erred.

In any event, even if the court abused its discretion, any error was harmless. It is not reasonably probable that Beltran would have achieved a more favorable result if the

12

court had admitted the details about Briones's potential punishment. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) That is because, as already described, other evidence established Briones's interest in cooperating with law enforcement from the time of his interview. He knew that he was facing criminal liability then, regardless of the precise punishment that he was facing. His arguable bias and motive to lie arose at that point. Indeed, defense counsel argued in closing that Briones had "a reason to lie . . . back when he was talking to" the investigating officer. The details of his potential punishment would have added little to that picture of Briones's arguable bias and motive to lie. (*People v. Cornwell* (2005) 37 Cal.4th 50, 94 [any error restricting cross-examination concerning witness's criminal liability was harmless "because of the ample other evidence that came before the jury suggesting reasons to believe that [the witness's] cooperation with law enforcement was not altruistic and that his testimony was the product of his hope to secure early release from prison"], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

For all of these reasons, the challenged evidentiary rulings did not amount to an abuse of discretion, and even if they did, any error was harmless.

C. *No Violation of Constitutional Rights*

Contrary to Beltran's assertion, the court's evidentiary rulings did not violate his federal constitutional rights to due process, to confront the witnesses against him, and to present a defense.

"[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010)

13

50 Cal.4th 1082, 1104, fn. 4.) And the exclusion of evidence does not violate the defendant's right to due process unless it renders the trial fundamentally unfair. (*People v. Quartermain* (1997) 16 Cal.4th 600, 626 (*Quartermain*).) Here, the challenged rulings "'merely rejected certain evidence concerning the defense.'" (*People v. Cowan* (2010) 50 Cal.4th 401, 473.) They did not prevent Beltran from impeaching Briones altogether or render his trial unfair. Beltran cross-examined Briones at length about Briones's reasons for pleading guilty, his methamphetamine use, his behavior during his law enforcement interview, his claim that he was unaware of the robberies, his memory of details from the robberies, his misdemeanor theft charge, and other topics. Under these circumstances, there was no violation of Beltran's right to present a defense or right to due process.

Similarly, there was no violation of Briones's right of confrontation. "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Quartermain*, *supra*, 16 Cal.4th at pp. 623-624.)

For reasons already discussed, a reasonable jury would not have formed a significantly different impression of Briones's credibility if the court had admitted the stricken testimony: Briones's potential punishment added little to the other evidence permitting a reasonable inference that he cooperated in the hope of being treated leniently. In addition, Briones's credibility was impeached by his unlikely claim that he did not realize the robberies had occurred, his admitted theft of a woman's purse without

14

any involvement by Beltran, and his methamphetamine use. The little effect that the two stricken answers might have had would not have resulted in a significantly different impression of his credibility. There was thus no confrontation clause violation. (*Quartermain*, *supra*, 16 Cal.4th at p. 624 [no confrontation clause violation, given that the witness's credibility was already extensively impeached].)

In sum, the challenged evidentiary rulings did not violate Beltran's constitutional rights.

## II. *Prosecutorial Misconduct and Ineffective Assistance Claim*

Beltran argues that the prosecutor committed prejudicial misconduct by misstating the burden of proof in her rebuttal argument. As Beltran acknowledges, defense counsel did not object to the claimed misstatements. Beltran therefore forfeited the prosecutorial misconduct argument. (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) We nevertheless reach the merits of the misconduct claim because Beltran argues that counsel rendered ineffective assistance by failing to object. The argument lacks merit.

### A. *Additional Background*

Beltran's argument on appeal involves CALCRIM No. 224, which states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more

15

reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

The prosecutor began her closing argument by observing that the jurors were there "to determine if the evidence has proved to you beyond a reasonable doubt that [Beltran is] guilty of the three robberies." She told them that the court would instruct them on the law and proceeded to review the evidence against Beltran.

In defense counsel's closing argument, he emphasized the "beyond a reasonable doubt" standard at least 14 times and suggested that the People had not carried their burden. Defense counsel also quoted portions of CALCRIM No. 224. He used the casino surveillance video to illustrate the concepts. Counsel argued that if the jurors thought it was reasonable that the video depicted someone other than Beltran—someone who merely had a "similar body type"—then the jurors had to indulge that reasonable interpretation of the evidence, and they could not use that video to convict Beltran.

In her rebuttal argument, the prosecutor stated:

"Counsel talked to you about [CALCRIM] instruction [No.] 224, circumstantial evidence. And in considering circumstantial evidence, if one explanation points to innocence and one points to guilt, you must pick the one that points to innocence, but you can only consider the reasonable conclusions.

"So let's consider. Is it reasonable that there was multiple people with a similar description in a small vicinity in less than a three-week period even at the same

16

intersection bearing the same short and stocky Hispanic male resemblance all being driven by Mr. Briones and all similarly having the same firearm, having the same MO, targeting the same type of vulnerable victim? Or is it reasonable that Mr. Beltran was, in fact, the only passenger in Mr. Briones's vehicle on September 18th at the bus stop, at the casino, . . . and at the fruit stand?

"Isn't it reasonable that all the circumstantial evidence in combination with Mr. Briones'[s] testimony—it's the only reasonable conclusion that Mr. Beltran is guilty as charged. That's why I ask you to render the only true and just verdict, guilty on all counts . . . ."

The prosecutor ended her rebuttal argument right after that statement, and the court proceeded to instruct the jury. Among other things, the court instructed the jurors that they had to follow the law as the court explained it, and if they believed that the attorneys' comments on the law conflicted with the court's instructions, they had to follow the court's instructions. (CALCRIM No. 200.) The court also instructed the jurors on the presumption of innocence and the People's burden of proving guilt beyond a reasonable doubt. (CALCRIM No. 220.) And the court instructed the jurors with CALCRIM No. 224, regarding circumstantial evidence.

B. *No Prejudicial Misconduct*

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.'" (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).) The prosecutor may argue that the jury should reject unreasonable

17

interpretations of the evidence. (*People v. Centeno* (2014) 60 Cal.4th 659, 672.) The prosecutor may also characterize a defense theory as an unreasonable interpretation of the evidence. (*Ibid.*) And the prosecutor may urge the jury to accept reasonably possible interpretations of the evidence. (*Ibid.*) But the prosecutor may not leave "the jury with the impression that so long as her interpretation of the evidence [is] reasonable," the People have carried their burden of proof. (*Ibid.*) That is because "[i]t is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Ibid.*)

To establish prosecutorial misconduct on the basis of comments to the jury, the defendant must "'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."' [Citation.] If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.'" (*Cortez*, *supra*, 63 Cal.4th at p. 130.)

Like most other errors, prosecutorial misconduct is subject to prejudice analysis. (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected."[2] (*Ibid.*) When the defendant claims that the

---

[2] Improper comments do not violate the federal Constitution unless "they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*Cortez*, *supra*, 63 Cal.4th at p. 130.) Beltran

prosecutor misstated the burden of proof, we ask "whether there is 'a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165-1166 (*Johnsen*).)

In this case, much of the prosecutor's argument was proper. She asked the jury to consider whether Beltran's interpretation of the evidence was reasonable, and she suggested that it was not. Similarly, she asked the jury to consider whether her interpretation of the evidence was reasonable, and she suggested that it was. But her final comments may have given the impression that the jurors could find Beltran guilty if they merely found her interpretation of the evidence reasonable: "Isn't it reasonable that all the circumstantial evidence in combination with Mr. Briones'[s] testimony—it's the only reasonable conclusion that Mr. Beltran is guilty as charged. That's why I ask you to render the only true and just verdict, guilty on all counts . . . ."

In *Centeno*, our Supreme Court held that similar comments were improper. (*Centeno*, *supra*, 60 Cal.4th at pp. 671-673.) *Centeno* was a sexual abuse case. In the prosecutor's rebuttal argument, she stated: "'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.*'" (*Id.* at p. 671.) She continued:

<hr />

does not allege a pattern of such conduct here. Rather, he points to a single instance in the rebuttal argument. (*Shazier*, *supra*, 60 Cal.4th at p. 151 [single instance of misconduct plus one "possible" instance did not constitute a pattern of misconduct].) Accordingly, the more stringent prejudice test for constitutional errors does not apply.

"'Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he['s] good for it? That is what is reasonable. He's good for it.*'" (*Id.* at p. 672.)

The *Centeno* court observed that much of the prosecutor's argument was unobjectionable. (*Centeno*, *supra*, 60 Cal.4th at p. 672.) She was permitted to urge the jury to accept the reasonable and reject the unreasonable. (*Id.* at p. 673.) But she had gone beyond that. She had "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence." (*Ibid.*) The court concluded that those remarks had "clearly diluted the People's burden" of proof. (*Ibid.*)

Here, even if the prosecutor improperly suggested that the jurors could find Beltran guilty on the basis of a reasonable account of the evidence, the comments did not prejudice Beltran. It is not reasonably probable that her argument caused one or more jurors to convict Beltran on a standard lower than proof beyond a reasonable doubt. (*Johnsen*, *supra*, 10 Cal.5th at pp. 1167-1168 [holding that the prosecutor's misstatements about the burden of proof were not prejudicial]; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 [same].)

The prosecutor noted the People's burden of proof beyond a reasonable doubt in her closing argument. Defense counsel stressed the People's burden of proof numerous times in his closing argument. In contrast, the prosecutor's objectionable rebuttal remarks consisted of a single unfinished sentence, which she followed with a legally proper argument that guilt was the *only* reasonable inference from the evidence. The prosecutor framed her remarks as a response to defense counsel's discussion of

20

CALCRIM No. 224, not as an illustration of the People's burden of proof. The remarks came at the end of the prosecution's rebuttal argument, after which the court instructed the jurors to follow the law as the court explained it and to disregard any attorneys' comments that conflicted with the court's instructions. The court then properly instructed the jurors on the presumption of innocence and the People's burden to prove Beltran's guilt beyond a reasonable doubt. In particular, the court told the jurors that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." (CALCRIM No. 220.) We presume that the jurors understood and followed the court's instructions and did not draw the most damaging inference from the prosecutor's brief argument. (*Shazier*, *supra*, 60 Cal.4th at p. 150; accord *People v. Bell* (2019) 7 Cal.5th 70, 111-112.) On this record, there is no reasonable probability that the prosecutor's isolated remarks caused the jury to convict Beltran on something lower than the proper standard.

Beltran analogizes this case to *Centeno*, but there the court based its prejudice finding on materially different circumstances. The *Centeno* prosecutor committed two errors in her rebuttal argument. The court devoted much of its error discussion to the first of those errors—the prosecutor's use of a diagram and a hypothetical to attempt to illustrate proof beyond a reasonable doubt. (*Centeno*, *supra*, 60 Cal.4th at pp. 665, 667-671.) The prosecutor displayed an outline of the shape of California and posited a hypothetical criminal trial in which the issue was, "'[W]hat state is this[?]'" (*Id.* at p. 665.) She described the testimony of hypothetical witnesses who imparted some accurate information but also some incomplete or inaccurate information about the state.

21

(*Ibid.*) She then argued that regardless of the incomplete, inaccurate, or missing information, the jury could "'still reach a decision beyond a reasonable doubt'" that the state was California. (*Ibid.*) The court reasoned that the "use of an iconic image like the shape of California . . . [was] a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt." (*Id.* at p. 669.) The image and the hypothetical necessarily drew on the jurors' preexisting knowledge rather than on the evidence, trivialized the deliberative process, encouraged the jurors to guess or to jump to a conclusion, and oversimplified the process. (*Id.* at pp. 669-671.)

The *Centeno* court held that the combination of the improper hypothetical and the other improper argument prejudiced the defendant. (*Centeno*, *supra*, 60 Cal.4th at pp. 676-677.) There was no reason for the jurors to reject the improper hypothetical—it did not contradict the trial court's instruction on proof beyond a reasonable doubt but purported to illustrate the standard. (*Id.* at p. 676.) The prosecutor introduced "further confusion by suggesting that it was 'reasonable' to believe that defendant was guilty." (*Ibid.*) While the trial court gave a few instructions after the rebuttal argument, it gave the majority of its instructions the day before closing arguments, including the instruction defining proof beyond a reasonable doubt (CALCRIM No. 220). (*Id.* at pp. 664-665, 676-677.) "As a result, the prosecutor's argument was the last word on the subject." (*Id.* at p. 677.)

Unlike the *Centeno* prosecutor, the prosecutor here did not use an improper hypothetical to attempt to define proof beyond a reasonable doubt. The prosecutor did not purport to define the concept at all. And even if she had, the prosecutor's rebuttal

22

argument was not the last word on the subject.  The court instructed the jury right after the argument.  This case is more like *Johnsen*, in which our high court held that the prosecutor's misconduct relating to the burden of proof did not prejudice the defendant. (*Johnsen*, *supra*, 10 Cal.5th at pp. 1167-1168.)  The *Johnsen* prosecutor misstated the law by arguing (1) that "the reasonable doubt standard require[d] jurors 'to point to something in the evidence that makes them have that doubt,'" and (2) that "in evaluating whether a perceived doubt is reasonable, a 'juror should be able to convince his or her fellow jurors that the doubt is reasonable.'"  (*Id.* at p. 1166.)  The *Johnsen* court concluded that the defendant suffered no prejudice because after the arguments, the trial court properly instructed the jurors on reasonable doubt and directed them to follow the instructions in the event of any conflicting statements.  (*Id.* at pp. 1164, 1167.)

For all of these reasons, any misstatement of the law by the prosecutor was not prejudicial to Beltran.  It is not reasonably probable that any misstatement caused the jurors to convict him on a standard of proof lower than beyond a reasonable doubt.

## C.  *No Ineffective Assistance*

To prevail on a claim of ineffective assistance of counsel, the defendant "'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'"  (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.)  But "defense counsel cannot be considered ineffective . . . for failing to make objections to misconduct" that caused the defendant no prejudice.  (*People v. Boyette* (2002) 29 Cal.4th 381, 437.)  Because any misconduct by the prosecutor did not prejudice Beltran, his ineffective assistance claim necessarily fails.

III. *Eyewitness Certainty Instruction*

Beltran argues that the court prejudicially erred and violated his constitutional rights by instructing the jurors that they could consider a witness's certainty in evaluating eyewitness testimony identifying the defendant.  (CALCRIM No. 315.)  We reject the argument.

CALCRIM No. 315 states in relevant part:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony."  The instruction sets forth numerous questions that the jury should consider in evaluating identification testimony.  (*Ibid.*)  One question is:  "How certain was the witness when he or she made an identification?"  (*Ibid.*)  Beltran contends that the instruction was "legally and scientifically incorrect" because studies have shown a weak relationship between certainty and the accuracy of an identification.

As a preliminary matter, Beltran acknowledges that defense counsel failed to object to the instruction, but he urges us to excuse the failure because any "'objection would have been futile or wholly unsupported by substantive law then in existence.'"  (*People v. Brooks* (2017) 3 Cal.5th 1, 92.)  We agree that any objection would have been futile or wholly unsupported by the substantive law then in existence:  At the time, our Supreme Court had approved of the instruction on the eyewitness certainty factor.  (*People v. Sanchez* (2016) 63 Cal.4th 411, 461-462.)  The court therefore was bound to reject any argument against the instruction.

Our Supreme Court recently reconsidered the eyewitness certainty instruction in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). *Lemcke* rejected the defendant's argument that the instruction violated his due process rights. (*Id*. at pp. 646-647, 654-661.) The *Lemcke* court nevertheless acknowledged that the instruction had "the potential to mislead jurors," given the "near unanimity in the empirical research that '"under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy."'" (*Id.* at p. 665.) But because of the complexities involved in determining how to revise the instruction, the court stopped short of attempting to rewrite it. (*Id.* at p. 668.) Instead, the court referred the matter to the Judicial Council and the council's Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id.* at p. 647; accord *id.* at p. 668.) In addition, the court exercised its supervisory powers to "direct that until the Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id*. at pp. 647-648; accord *id.* at p. 669.)

For the reasons set forth in *Lemcke*, we reject Beltran's due process argument. The instruction did not expressly equate certainty with accuracy. (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) Even if it were susceptible to that interpretation, Beltran could have proffered expert testimony combatting the interpretation, as the *Lemcke* defendant did. (*Id.* at pp. 657-658.) Moreover, the court's other instructions undercut any argument that the certainty instruction lowered the People's burden of proof. (*Id*. at p. 658.) The court

25

instructed the jurors that Beltran was presumed innocent and that the People had the burden of proving guilt beyond a reasonable doubt (CALCRIM No. 220). (*Lemcke*, at p. 658.) And the court instructed the jurors that "[p]eople sometimes honestly . . . make mistakes about what they remember" (CALCRIM No. 226), that the jurors were responsible for "judg[ing] the credibility or believability of the witnesses," and that the People had "'the burden of proving beyond a reasonable doubt that it was [Beltran] who committed the crime'" (CALCRIM No. 315). (*Lemcke*, at p. 658.) Finally, Beltran had an opportunity to cross-examine the witnesses who he claims identified him with certainty—Briones and the investigating officer. (*Id.* at p. 660.) Accordingly, the eyewitness certainty instruction did not render Beltran's trial fundamentally unfair or otherwise violate his due process rights. (*Id.* at p. 661.)

Moreover, to the extent that *Lemcke* disapproved of the existing certainty instruction, any claimed error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 ["harmless beyond a reasonable doubt" standard for constitutional errors]; *Watson*, *supra*, 46 Cal.2d at p. 836 [reasonable probability standard for state law errors].)

Beltran argues that the certainty instruction would have influenced the jury with respect to identifications by Briones and the investigating officer, but the certainty instruction did not apply to the testimony on which he relies. First, Beltran claims that Briones expressed certainty about whether Beltran was with him during the fruit stand robbery. That is incorrect. Beltran cites the following exchange between the prosecutor and Briones about Briones's memory of the events:

26

"Q. BY [the prosecutor]:  With, I guess, your affected memory of the specifics, are you able to remember that it was, in fact, Mr. Beltran with you at this time?

"A.  Yes.

"Q.  Is there anyone else with you?

"A.  No.

"Q.  Are you certain of that?

"A.  Yes.

"Q.  So that you remember?

"A.  Yeah."

Briones thus testified that he was certain there was no one besides Beltran with him during the fruit stand robbery.  His expressed certainty related to his memory of whether he had other companions that day.  He did not express certainty about an eyewitness identification of Beltran, so the jurors would not have applied the eyewitness identification instruction to that testimony.  The court instructed the jurors that some of its instructions may not apply and to follow the instructions that do apply to the facts.  (CALCRIM No. 200.)  We presume that the jurors understood and followed that instruction.  (*Shazier*, *supra*, 60 Cal.4th at p. 150.)

Second, Beltran points out that the investigating officer identified Beltran in the casino surveillance video.  The investigating officer did not state whether he was certain about the identification.  Even if he had, it was clear that the investigating officer was not an eyewitness to the robberies or the events at the casino that day.  The prosecutor played the surveillance video for the jurors, the court admitted the video into evidence, and the

27

jurors could judge for themselves whether the video depicted Beltran. The jurors would not have applied an instruction about eyewitness identification to the officer's testimony about the video.

In sum, the court did not violate Beltran's due process rights by instructing the jurors on the eyewitness certainty factor. And even if the instruction were erroneous, the jurors would not have applied the instruction as Beltran contends, so any error was harmless.[3]

IV. *Statement of Victim Restitution in the Abstract of Judgment*

The court ordered Beltran to pay victim restitution in the amount of $2,555.00. The court specified that Beltran and Briones were jointly and severally liable for the victim restitution. Beltran contends, and the People agree, that the abstract of judgment erroneously fails to reflect the joint and several liability. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535 [ordering the abstract of judgment corrected to reflect joint and several liability for victim restitution].)

The abstract of judgment merely contains a typographical error. Section 13 of the abstract sets forth victim restitution. The last sentence fragment of that section states: "Joint and severed liability." The minute order of the sentencing hearing contains the same typographical error. In an abundance of caution, we order the sentencing minute

---

[3] Beltran argues that he was cumulatively prejudiced by the restriction of Briones's cross-examination, the prosecutor's misconduct, and the claimed instructional error. Even if the prosecutor's comments were improper, there were no other errors to cumulate. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1179.)

order and abstract of judgment amended to reflect that Beltran's liability for victim restitution is joint and several, not joint and severed.

## DISPOSITION

The trial court shall prepare an amended sentencing minute order and an amended abstract of judgment reflecting that Beltran's liability for victim restitution is joint and several, not joint and severed. The trial court is directed to send a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.